# ATTACHMENT TO APPLICATION FOR TRACKING WARRANT

## AFFIDAVIT

Your Affiant, James H. Joiner, being duly sworn, declares and states the following:

## INTRODUCTION

1. Your Affiant is a sworn Special Agent (SA) of the United States Drug Enforcement Administration (DEA) assigned to the New Orleans Field Division, Mobile Resident Office (MRO), and has been since November 2020. Your Affiant is a bonded law enforcement officer and has been employed by the Drug Enforcement Administration (DEA) since April 2020. Your Affiant has completed basic agent training academy in Quantico, Virginia where extensive hours were spent on learning drug investigative tactics, techniques, and procedures. Your Affiant has participated in numerous drug-related investigations that have resulted in the arrest, apprehension, and conviction of those involved in the distribution of controlled substances and other felonious activities subject to state and federal law. Your Affiant is familiar with the common methods of packaging and the transporting of illegal controlled substances to include, but not limited to, marijuana, cocaine, methamphetamine, heroin, fentanyl, pharmaceutical medication, and synthetic narcotics to include "Spice" and "Molly." Your Affiant is also familiar with current distribution methods, packaging, and transporting of money derived from illegal narcotic sales. Your Affiant has prepared, participated in, and executed multiple search warrants for recovery of evidence involving the distribution of controlled substances and other felonious activities subject to state and federal law.

2. This affidavit is made in support of an application for a warrant authorizing the installation, monitoring, maintenance, use, repair, replacement, and removal of a tracking device on a 2016 black Nissan Maxima sedan bearing Alabama license plate number ▮▮▮▮ registered to Mario DELFIACCO III and James Edward HENDERSON (hereinafter "**TARGET VEHICLE**"). As set forth in this affidavit, your Affiant has probable cause to believe that James Edward HENDERSON, while operating the **TARGET VEHICLE**, is committing violations of federal law, including, but not limited to, conspiracy and possession with intent to distribute controlled substances, namely cocaine and methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3. The facts and information contained in this affidavit are based on your Affiant's information received in your Affiant's official capacity from other individuals, including federal, state, and local law enforcement officers. The Affiant has received credible information specifically from investigators of the DEA Pensacola Resident Office regarding this investigation. Because this affidavit is being submitted for the limited purpose of securing the aforementioned tracking warrant, your Affiant has not included each and every fact known concerning this investigation. Your Affiant has set forth only the facts that your Affiant believes are necessary to establish probable cause.

**2019 INVESTIGATION**

4. During the month of April 2019, a Gulf Breeze Police Department ("GBPD") Confidential Source #1 ("CS-1") began providing information about HENDERSON distributing ounce quantities of cocaine within Escambia County and Santa Rosa County, Florida. CS-1 became a documented confidential informant for the GBPD Special Investigations Division in May 2019 in exchange for consideration for pending felony narcotics charges. CS-1 provided information

2

about HENDERSON selling cocaine within Santa Rosa County, Florida. According to CS-1, HENDERSON was selling ounce amounts of cocaine for $1,300 per ounce. CS-1's information has been deemed reliable because it is consistent with other information provided by other sources, and verified by other information obtained from law enforcement indices or databases, physical surveillance, through controlled purchases of cocaine, and monitored conversations, including telephone calls between CS-1 and HENDERSON in the presence of law enforcement officers. No information provided by CS-1 during the course of his/her cooperation with GBPD and DEA has been found to be false or misleading.

5. On May 1, 2019, at approximately 2:30 pm, CS-1 met with law enforcement officers for the purpose of conducting a controlled purchase of an "eight ball," or 3.5 grams, of cocaine from HENDERSON. At law enforcement direction, CS-1 called HENDERSON and finished arranging the purchase of cocaine from HENDERSON as previously discussed. After a series of telephone calls, CS-1 and HENDERSON agreed to meet at 15 Brent Lane, Pensacola, Florida. Prior to the controlled purchase taking place, CS-1 was searched by law enforcement, with no contraband or currency being discovered. CS-1 was then provided with police recorded drug buy money and equipped with an electronic monitoring device to record and transmit audio of the meeting with HENDERSON. At approximately 4:00 pm, under the constant surveillance of law enforcement, CS-1 traveled to the meeting location to meet HENDERSON. Surveillance was established at the meeting location prior to CS-1's arrival. Shortly after CS-1's arrival, HENDERSON was observed arriving in the **TARGET VEHICLE**. Upon arrival, HENDERSON made contact with CS-1. During contact, CS-1 provided HENDERSON with police recorded drug buy money in exchange for the requested cocaine. Following the transaction, surveillance was maintained on CS-1 as he/she traveled to a rally

location. Upon arrival, CS-1 was again searched, and no additional contraband or currency was found by law enforcement. The purchased cocaine was subsequently field-tested, which produced a presumptive positive result for cocaine and weighed approximately 3.7 grams.

6. On May 14, 2019, at approximately 1:30 pm, CS-1 met with law enforcement officers for the purpose of introducing Undercover DEA special agent ("UC") to HENDERSON for the purpose of conducting a controlled purchase of an "eight ball," or 3.5 grams, of cocaine from HENDERSON. At law enforcement's direction, CS-1 made contact with HENDERSON via telephone and requested to bring UC to purchase cocaine from HENDERSON. During this conversation, HENDERSON agreed to sell UC the requested cocaine in the parking lot of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At approximately 3:40 pm, under the constant surveillance of law enforcement, CS-1 and UC traveled to the meeting location to meet HENDERSON. Surveillance was established at the meeting location prior to CS-1's and UC's arrival. Just after CS-1's and UC's arrival, HENDERSON arrived at the meeting location in the **TARGET VEHICLE**. Upon HENDERSON's arrival, HENDERSON made contact with CS-1 and UC. During this contact, UC provided HENDERSON with police recorded drug buy money in exchange for the requested cocaine. The purchased cocaine was subsequently field-tested, which produced a presumptive positive result for cocaine and weighed approximately 3.5 grams.

7. On June 5, 2019, HENDERSON agreed to sell UC cocaine and arranged to meet at the parking lot of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. UC was provided $1,350.00 in police recorded drug buy money and equipped with an electronic monitoring device to record and transmit audio of the meeting with HENDERSON. At approximately 2:30 pm, under the constant surveillance of law enforcement, UC traveled to the meeting location to meet HENDERSON.

Surveillance was established at the meeting location prior to UC's arrival. Shortly after UC's arrival, HENDERSON arrived at the meeting location in the **TARGET VEHICLE**. Upon HENDERSON's arrival, HENDERSON made contact with UC and provided UC with the requested cocaine in exchange for police recorded drug buy money. The purchased cocaine was subsequently field-tested, which produced a presumptive positive result for cocaine and weighed approximately one (1) ounce. Surveillance was attempted on HENDERSON after the transaction. However, it was unsuccessful due to the traffic conditions and his erratic driving patterns.

8. On July 11, 2019, HENDERSON agreed to sell UC cocaine and arranged to meet at the parking lot of ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. Prior to the controlled purchase taking place, UC was provided with $1,400.00 in police recorded drug buy money and equipped with an electronic monitoring device to record and transmit audio of the meeting with HENDERSON. At approximately 1:30 pm, under the constant surveillance of law enforcement, UC traveled to the meeting location to meet HENDERSON. Surveillance was established at the meeting location prior to UC's arrival. Shortly after UC's arrival, HENDERSON arrived at the meeting location in the **TARGET VEHICLE**. Upon HENDERSON's arrival, HENDERSON made contact with UC and provided UC with the requested cocaine in exchange for police recorded drug buy money. The purchased cocaine was subsequently field-tested, which produced a presumptive positive result for cocaine and weighed approximately one (1) ounce. Surveillance was attempted on HENDERSON after the transaction. However, it was unsuccessful due to the traffic conditions and his erratic driving patterns.

9. On October 10, 2019, HENDERSON agreed to sell UC cocaine and arranged to meet at the parking lot of Hampton Inn, 61 Gulf Breeze Parkway, Gulf Breeze, Florida. Surveillance was established at the meeting location prior to UC's

arrival. Shortly thereafter, HENDERSON arrived at the meeting location in the **TARGET VEHICLE**. Upon HENDERSON's arrival, Gulf Breeze Police Department Investigator's made contact with HENDERSON at the driver window of the **TARGET VEHICLE** and explained the reason for the contact. HENDERSON admitted to traveling to the Hampton Inn to sell the cocaine ordered by UC. HENDERSON turned over the cocaine to law enforcement. The cocaine was subsequently field-tested, which produced a presumptive positive result for cocaine and weighed approximately thirty-three grams. HENDERSON was subsequently arrested and charged with Trafficking Cocaine in violation of Florida State Statute 893.135.1B1. *See* 5719CF001945A-A. The case is still pending in state court.

## 2021 INVESTIGATION

10. During the month of February 2021, PPD began a narcotics investigation on HENDERSON, after being alerted by Confidential Source #2 ("CS-2") that Henderson was selling narcotics. CS-2 stated Henderson was selling cocaine. CS-2's information has been deemed reliable because it is consistent with other information provided by other sources, and verified by other information obtained from law enforcement indices or databases, physical surveillance, through controlled purchases of cocaine, and monitored conversations, including telephone calls between CS-2 and HENDERSON in the presence of law enforcement officers. No information provided by CS-2 during the course of his/her cooperation with PPD and DEA has been found to be false or misleading.

11. Law enforcement databases showed an address for HENDERSON at ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Surveillance was conducted, confirming HENDERSON'S regular presence at the address. The **TARGET VEHICLE** was regularly parked at the residence. HENDERSON has been seen driving the **TARGET VEHICLE** for approximately two years by various law enforcement

6

agencies.

12. During the month of March 2021, two controlled buys were conducted from HENDERSON out of the **TARGET VEHICLE**.

13. On or about March 10, 2021, CS-2 communicated by text with HENDERSON, at law enforcement's direction, to arrange a narcotics transaction. HENDERSON agreed to sell CS-2 cocaine and arranged to meet at ▮▮▮▮▮ ▮▮▮▮. CS-2 met with law enforcement at a predetermined location, was searched, and was found not to be in possession of narcotics or currency. The vehicle being driven by CS-2 was searched and did not have currency or narcotics inside. CS-2 was equipped with a monitoring device. HENDERSON was seen by law enforcement arriving at his residence, ▮▮▮▮▮▮▮▮▮▮, driving the **TARGET VEHICLE**. CS-2 was continuously surveilled by law enforcement until reaching ▮▮▮▮▮▮▮▮▮▮▮. Minutes following HENDERSON'S arrival, the controlled buy was conducted from the **TARGET VEHICLE** for an amount of cocaine. Following the controlled buy, surveillance was attempted on HENDERSON driving away from his residence, but failed due to HENDERSON'S driving pattern. The cocaine purchased field tested presumptive positive for the characteristics of cocaine.

14. On or about March 12, 2021, CS-2 communicated by text with HENDERSON, at law enforcement's direction, to arrange a narcotics transaction. HENDERSON agreed to sell CS-2 methamphetamine and arranged to meet at ▮▮▮▮ ▮▮▮▮▮▮▮ CS-2 met with law enforcement at a predetermined location, was searched, and was found not to be in possession of narcotics or currency. The vehicle being driven by CS-2 was searched and did not have currency or narcotics inside. CS-2 was equipped with a monitoring device. HENDERSON was seen by law enforcement arriving at his residence, ▮▮▮▮▮▮▮▮▮▮, driving the **TARGET**

7

**VEHICLE**. CS-2 was continuously surveilled by law enforcement until reaching ▬▬▬▬▬▬▬. Minutes following HENDERSON'S arrival, the controlled buy was conducted from the **TARGET VEHICLE** for methamphetamine. Following the controlled buy, surveillance was attempted on HENDERSON driving away from his residence, but failed due to HENDERSON driving pattern. The methamphetamine purchased field tested positive for methamphetamine.

15. Surveillance conducted on HENDERSON revealed that he regularly travels to Mobile, Alabama. Due to HENDERSON'S interstate travels and driving behavior standard surveillance practices have proven futile. Surveillance has been attempted several times, with negative results due to Henderson's erratic driving patterns. The only individual observed driving the **TARGET VEHICLE** during the investigation was HENDERSON.

16. On or about April 7, 2021, the **TARGET VEHICLE** was observed at a residence in Mobile, Alabama, that is frequently visited by HENDERSON.

17. Based on your Affiant's training, experience, and the facts set forth in this affidavit, there is probable cause to believe that the **TARGET VEHICLE** is being used by HENDERSON in furtherance of drug trafficking activity. The use of an electronic tracking device on the **TARGET VEHICLE** will provide additional evidence of violation of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution or possession with intent to distribute a controlled substance and conspiracy). This evidence is expected to include stash or storage locations of controlled substances and the identity of co-conspirators.

18. As such, your Affiant is requesting authorization to install, use, maintain, and monitor an electronic tracking device on the **TARGET VEHICLE** for a period not to exceed forty-five (45) days from the date this warrant is executed.

19. Agents intend to install the electronic tracking device on the **TARGET**

8

**VEHICLE** when it is deemed safe for law enforcement agents to do so. It is unknown at what time of day or night this will occur. Agents will take into account the safety of all officers involved and any other parties present, as well as the integrity of the investigation when performing the installation of the electronic tracking device.

20. Notifying HENDERSON of the installation and use of the tracker on the **TARGET VEHICLE** at the conclusion of the authorized period will compromise the integrity of the ongoing investigation into HENDERSON's drug trafficking activity; therefore, a delay in notification for 30 days.

21. WHEREFORE, your Affiant requests authorization to install, use, maintain, monitor and remove an electronic tracking device on the **TARGET VEHICLE**, identified as a 2016 black Nissan Maxima sedan, bearing Alabama license plate number ███████, and further requests authorization to install, use, maintain, and monitor said device for a period not to exceed forty-five (45) days from the date the warrant is executed.

22. On April 09, 2021 the Honorable U.S. Magistrate Judge, Hope Thai Cannon, in Pensacola, Florida, signed a tracked warrant affidavit, in an attempt to conduct a tracker connection in Pensacola, Florida. Because the **TARGET VEHICLE** is currently staying at ███████████████████████; DEA Agents and TFO's are unable to safely attach the tracker to the **TARGET VEHICLE**. The **TARGET VEHICLE** does stay at the above Mobile address for extended periods of time during the night hours. The **TARGET VEHICLE** does come into the Pensacola, Florida area on a daily basis to conduct illicit narcotic sales and distribution.

However, the vehicle is never in an area long enough for law enforcement to place the tracker safely. The **TARGET VEHICLE** is at the above-mentioned address for long periods of time which is in an area where law enforcement can safely place the tracker on the **TARGET VEHICLE** without being compromised.

_____
James H. Joiner
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this ____ day of _____, 2021, in Mobile, Alabama, in that the above affiant attested to the contents of the foregoing written affidavit via reliable electronic means.

_____
U.S. Magistrate Judge Katherine P. Nelson

Digitally signed by U.S. Magistrate Judge Katherine P. Nelson
DN: cn=U.S. Magistrate Judge Katherine P. Nelson, o=Federal Judiciary, ou=U.S. Government, email=efile_nelson@alsd.uscourts.gov, c=US
Date: 2021.04.21 14:50:39 -06'00'

Honorable Katherine P. Nelson
United States Magistrate Judge

10